UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

E. I. Du Pont De Nemours and Company,

                              Plaintiff,

                                                                         Decision
                                                                         &amp;
                       v.                                                      ORDER

                                                                         05CV317S

United Steel et al.,
                              Defendant(s).

Before the Court is plaintiff E.I. Du Pont De Nemours and Company"s ('DuPont") motion to remand this matter back to state court.

**Background**

DuPont commenced this action in New York State Supreme Court alleging various state court claims including misappropriation of trade secrets and confidential business information, return of chattel, and conversion of property. It appears that DuPont and the defendants are currently involved in labor-management discussions, including issues relating to safe working conditions. At one meeting, the defendants produced pictures obtained by James L. Briggs ("Briggs"), an International Business Representative for the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

1

("Union").[1]  These pictures purportedly reveal unsafe working conditions at DuPont's Niagara Falls facility (the "Niagara Site").  DuPont asserts that the pictures also reveal trade secrets. DuPont contends that Briggs should not have taken the pictures and that they must be "returned" to DuPont.  DuPont initiated that state court action for this purpose. The Union disputes the contention that the pictures contain trade secrets. (Docket No. 16 at ¶ 41).[2]

In removing this matter from the state court, the defendants assert that DuPont's attempts to obtain the pictures is inextricably intertwined with the discussions relating to unsafe working conditions under the collective bargaining agreement ("CBA")[3], and thus, are actions over which

---

[1]  It appears that some unidentified DuPont employee took the pictures and gave them to Briggs.  (Docket No. 7 at page 3).

[2]  In deciding the current motion, the Court need not determine the question of whether or not the pictures contain trade secrets or unsafe work conditions.  The Court notes that DuPont asserts, in conclusory fashion, that the pictures contain trade secrets. It is not clear whether DuPont is claiming that *all* of the pictures obtained by Briggs contain trade secrets or merely some of the pictures.  The record does not reflect whether DuPont has had an opportunity to view all of the pictures at issue.  The Court further notes that DuPont did present an affidavit to be filed under seal which purported to discuss confidential trade secret information demonstrating that the pictures at issue constituted trade secrets.  Because federal court proceedings are presumptively public, the Court declined to grant the motion to seal the affidavit inasmuch as contrary to DuPont's representations the affidavit contained mere generalizations and not commercially sensitive information which might warrant proceeding outside of public scrutiny. DuPont also filed a reply affirmation by Douglas M. Clarke, Jr. which states that he saw "a number" of the photographs, that they depict "various aspects of lithium and sodium processes and equipment" and that "there can be no question that the photographs contain trade secrets" belonging to DuPont. (Docket No. 22 at ¶¶ 2-4).  Notwithstanding such statements, although DuPont has represented that the pictures depict  "unique" equipment used at the Niagara Site, neither the proposed affidavit nor the remaining record contained any information to assess the veracity of this claim.  Similarly, the Union also asserts only conclusory representations that the pictures depict "unsafe working conditions."  Again, absent from the record is any information weighing on the validity of this proposition.

[3]  It is undisputed that the Union and DuPont are signatories to an agreement effective May of 1995 which was in full force and effect with respect to the time period relevant to this action, and continues to be in effect as of this date.  See Agreement attached as Exhibit A to

original federal court jurisdiction exists pursuant to §301 of the Labor Management Relations Act ("LMRA")(codified at 29 U.S.C. §185).

**Discussion**

Generally, because federal courts are courts of limited jurisdiction, it is the removing party's burden to demonstrate the existence of federal jurisdiction. United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir.1994)("Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper ...."). A defendant may remove an action originally filed in state court to federal court if the case originally could have been filed in federal court. See 28 U.S.C. § 1441(a). Absent diversity of citizenship, a case may be filed in federal court in the first instance "when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). Pursuant to this rule, commonly referred to as "the well-pleaded complaint rule," removal generally is not permitted simply because a defendant intends to defend the case on the basis of federal preemption. See Foy v. Pratt & Whitney Group, 127 F.3d 229, 232 (2d Cir.1997). However, the "complete preemption corollary" to the well-pleaded complaint rule, which applies to claims brought under §301 of the LMRA, provides "that any claim based on preempted state law is considered a federal claim arising under federal law." Id. (internal quotations omitted). The "unusual preemptive power" accorded §301 extends to create federal

---

Docket No. 16.

jurisdiction even when the plaintiff's complaint makes no reference to federal law and appears to plead an adequate state claim. Livadas v. Bradshaw, 512 U.S. 107, 122 n. 16 (1994). Thus, even though the parties might agree that plaintiff's well-pleaded complaint alleges on its face only state claims, and no one argues that diversity of citizenship exists between the parties, if plaintiff's state claims are preempted by §301, federal jurisdiction exists and the removal of his case was proper. Hernandez v. Conriv Realty Assocs., 116 F.3d 35, 38 (2d Cir.1997). The central question to be resolved is whether §301 preempts plaintiff's state claims. See Vera v. Saks & Co., 335 F.3d 109, 113-114 (2d. Cir. 2003).

> Section 301 provides that:
>
>> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

The Supreme Court has interpreted §301 "as a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 209 (1985). Thus, when a state claim alleges a violation of a labor contract, the Supreme Court has held that such claim is preempted by §301 and must instead be resolved by reference to federal law. Id. at 210. Further, the Supreme Court has extended the preemptive effect of §301 beyond suits alleging contract violations:

> [Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

Allis-Chalmers, 471 U.S. at 211.

The Supreme Court stated that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a §301 claim, or dismissed as pre-empted by federal labor-contract law." Allis-Chalmers, 471 U.S. at 220 (internal citation omitted).

The Second Circuit has held that "Federal law preempts such state claims to further the federal goal of developing a uniform federal common law to govern labor disputes, 'lest common terms in bargaining agreements be given different and potentially inconsistent interpretations in different jurisdictions.'" Vera, 335 F.3d at 114 -115 quoting Livadas, 512 U.S. at 122. Not every suit concerning employment or tangentially involving a CBA, however, is preempted by §301. *See* Allis-Chalmers, 471 U.S. at 211. The preemption rule has been applied only to assure that the purposes animating §301 will be frustrated neither by state laws purporting to determine questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, nor by parties' efforts to renege on their arbitration promises by relabeling as tort suits actions simply alleging breaches of duties assumed in collective-bargaining agreements. Livadas, 512 U.S. at 122-23 (internal citations and quotation marks omitted).

Thus, the Court must consider "whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract," Allis Chalmers, 471 U.S. at 213, or whether the tort analysis is "substantially dependent" upon analysis of the labor agreement, Id. at 220; Panczykowski v. Laborers' Intern. Union of North America, 2001 WL 77035 (2d. Cir. 2001).

DuPont contends that the elements of its state claims of misappropriation of trade secrets, return of chattel and conversion do not affect the CBA and do not require any reference to or interpretation of the terms of the CBA.  However, the record reflects that the dispute revolving around the pictures did not arise in a vacuum.  It appears undisputed that the pictures were obtained and disclosed in connection with on-going discussions between the Union and DuPont relating to health and safety issues at the Niagara Site.[4]   Further, it appears that the history of these discussions extends back several years.  The Union asserts that after being denied information and access by DuPont to the Niagara Site to assess safety conditions, the Union filed an unfair labor practice charge (3-CA-23797-1) with the National Labor Relations Board ("NLRB") on September 4, 2002.  Once again, after another request for information and access to the Niagara Site was denied, the Union asserts that it filed another unfair labor practice charge with the NLRB on February 19, 2003.  A 10-day hearing was held before an Administrative Law Judge commencing on April 28, 2003. [5]  The ALJ determined that DuPont had violated §8(a)(5)

---

[4]  It is undisputed that the Union is the exclusive bargaining agent for all employees in DuPont's plant in Niagara Falls.

[5]  In addition to the health and safety issues, the administrative hearing also involved other issues raised in the Unions respective unfair labor practice charges. The other charges are not relevant to this action.

of the National Labor Relations Act ("NLRA") by unreasonably delaying its responses to certain requests for information. See E.I. DuPont de Nemours & Co. Inc. and Niagara Plant Employees Union and Paper, Allied-Industrial, Chemical and Energy Workers, Local 1-5025, 2004 NLRB LEXIS 281, ("the NLRB Decision") at *99 (attached as Exhibit B to Docket No. 16).  In addition, it appears that the Union had made several requests to have an expert inspect the Niagara Site relating to health and safety issues.  In the NLRB Decision, the ALJ states:

> Because the Union felt that [DuPont]'s supply of information was inadequate and unwieldy, the Union decided to take another direction.  By letter dated October 24, Briggs requested that [DuPont] "provide dates for experts hired by the Union to review safety issues addressed by the Union during negotiations and by the Membership.  This would be a Plant tour of all areas of the Plant."  Briggs credibly[6] testified that, in addition to [DuPont]'s failure to reply adequately to the Union's earlier requests, he wanted information regarding "safety issues [which] continued to come up [in negotiations], "such as moving 'buggies' containing hot, molten sodium over pot holes in a floor or on uneven floors; stain leaks, evidencing the possibility of water contacting sodium and lithium, which might result in an explosion; employees performing jobs resulting in repetitive motion injuries; working with sodium which was extremely hot; structural failures, such as the collapse of a fan; and employees 'falling out," or overcome by the intense heat of working with sodium."  A tour by a (sic) expert would be helpful to the Union in formulating proposals for collective-bargaining, Briggs insisted, particularly because the Union had not had a long relationship with [DuPont], the affiliation with PACE occurring only in May.

Docket No. 16, Exhibit B at *103-104.

According to the ALJ, DuPont insisted that an inspection was "unnecessary" but asked for more information so that DuPont could make a determination regarding the request.  The ALJ

---

[6]  This represents a determination of credibility made by the ALJ.

found that a subsequent letter from the Union to the DuPont did not address all the information DuPont had requested. The ALJ determined that DuPont failed to respond to the Union's letter and that the Union then sent DuPont another letter requesting access to the Niagara Site on February 17 and 18, 2003 so that the Union's expert could tour the facility. The ALJ found that at a bargaining session on February 7, 2003, the Union answered most of the questions DuPont had raised with respect to the requested inspection and agreed to answer any others prior to the proposed inspection on February 17, 2003. Notwithstanding, on February 10, 2003 DuPont wrote to the Union and refused to provide access for the inspection. After a discussion of the applicable law, the ALJ found that DuPont again violated §§8(a)(1) and (1) of the NLRA:

> The genesis of the Union's request for access was its request for information resulting from Respondent's decision to cease the production of Terathane and to restructure the sodium operation. As found above, Respondent had not supplied information that related to the health and safety conditions at its facility. Complaints involving the safety conditions continued to be raised in negotiations by the Union, culminating in the February 7 meeting, where, among other matters, specific safety issues were raised about the uneven floors in Buildings 6 and 16, among other places. The employees alleged that hazards existed; management, particularly Kober, denied that the floors were uneven or denied previously being informed of the conditions.
>
> There is sufficient evidence that the Union complained of dangerous conditions, and [DuPont] knew of them but either tried to avoid their existence or their seriousness or tried to avoid their being investigated by a trained expert, as the Union has requested. I conclude that [DuPont] violated Section 8(a)(1) and (1) of the Act by refusing to permit such an inspection.[7]

---

[7] The ALJ went on to state that "[t]he proof was insufficient" as to the need for the inspection based upon the Union's assumption from NPEU of the representation of the employees. (Docket No. 16, Exhibit B at *109). The import of this language is unclear, particularly in light of the fact that the ALJ ordered DuPont to cease and desist from refusing to permit the Union's expert to inspect the plant.

NLRB Decision, Docket No. 16, Exhibit B at *109.  Among other things, the ALJ ordered DuPont to cease and desist from failing to provide the Union with relevant information and "[r]efusing to permit the Union's health and safety expert to tour its plant for the purpose of reviewing health and safety issues raised by the Union in collective bargaining." NLRB Decision, Docket No. 16, Exhibit B at *115.   DuPont did *not* file exceptions to the ALJ's decision. The NLRB adopted the findings of fact and conclusions as its own on October 29, 2004.

In its reply, DuPont notes that the Union also did not appeal the NLRB decision (presumably as to the other issues raised by the Union in its respective NLRB charge which are not relevant to this action). (Docket No. 21 at ¶ 13). Instead, DuPont contends that the parties advised the NLRB that they would negotiate a confidentiality agreement to cover the production of sensitive documentation and to allow the inspection sought by the Union. DuPont suggests that the parties are close to an agreement on these issues. (Docket No. 21 at ¶ 14).  Finally, DuPont suggests that the NLRB decision "conditioned" the Union's access to inspect the facility on the signing of an appropriate confidentiality agreement. (Docket No. 21 at ¶ 15).  DuPont does not cite to any page in the NLRB Decision which conditions access upon the execution of a confidentiality agreement. The Court notes that the text of the NLRB Decision under the heading "The Union's Request to Inspect Respondent's Facility" does not condition access upon the execution of a confidentiality agreement.  Nor do the "Remedy" and "Order" sections of the NLRB Decision appear to set such a condition.

Despite the NLRB ruling, the Union asserts that DuPont has continued to deny the Union access to have its expert inspect the facility.  Affidavit of James L. Briggs dated May 13, 2005 ("the Briggs Affidavit") at ¶ 21.  Briggs asserts that in August 2004, he anonymously received 25

pictures through the mail slot in the door at the Union's office. Briggs stated that he was uncertain whether these pictures were of DuPont's Niagara Site or some other plant. In November of 2004, he showed the pictures to an individual who used to work at the Niagara Site. This individual confirmed that the pictures were of the Niagara Site. Briggs Affidavit at ¶ 25.

According to the Union, concerns over safety at DuPont's Niagara Site have increased since negotiations about safety issues began. It appears that one employee was injured in November of 2003 after inhaling chlorine gas. In June of 2004, the Occupational Safety and Health Administration ("OSHA") cited DuPont for failing to record that on-site injury at the Plant. Briggs Affidavit at ¶ 27. Briggs asserts that in March of 2005, another employee was severely burned by lithium while manually releasing pressure from a lithium cell notwithstanding that DuPont's Operating Instructions call for this procedure to be performed in a different manner. Briggs alleges that when members of an "Emergency Response Team" went to the Plant to evaluate the cause of the accident as well as the safety conditions of that area of the Plant, DuPont refused to allow them access.[8]  Briggs Affidavit at ¶ 29.

It is with this background that Briggs disclosed the pictures to DuPont representatives at a negotiation session on April 6, 2005 after DuPont denied the existence of unsafe working conditions at the Niagara Site. The Union contends that the pictures are inextricably intertwined with the negotiations authorized under Article XIII of the CBA. Article XIII provides that "[s]afety, health and sanitary conditions will be proper subjects for discussion between

---

[8] DuPont asserts that the "Emergency Response Team" consisted of Briggs, a union industrial hygienist, and President of the local, Marty Freeburg. DuPont states that it would not allow Briggs or the hygienist because they had not signed a confidentiality agreement. (Docket No. 21 at ¶ 10).

Management and the Union at any mutually convenient time." This implicitly suggests that the Union is entitled to possess information regarding the state of working conditions at DuPont's Niagara Site facility.  An interpretation of the CBA is also required to determine whether DuPont can impose confidentiality requirements upon the Union with respect to the discussions or information relating to health and safety issues.[9]

The Union also argues that DuPont's claims implicate Article III which recognizes the Union as being the sole agent for the purpose of collective bargaining as to working conditions. DuPont's state court action also seeks injunctive relief requiring the Union to "disclose to DuPont ... the identity of any unauthorized person or entity to whom these photographs were transferred" and to "assist and cooperate with DuPont so it may effectively conduct its investigation" regarding the photographs. See Docket No. 1 at Exhibit 1, page 2.  DuPont also seeks to bind the Union to the terms of the "Employee Agreement" required by DuPont of its employees as if the Union "were employees of DuPont."  See Docket No. 1 at Exhibit 1, page 3. Finally, DuPont seeks relief in the state court ordering the Union to desist from "interfering with DuPont's access to, collection, possession and preservation of any photographs" of the interior of the Niagara Site.  Id.  Such requests for relief appear to affect the Union's duty of fair representation of bargaining unit employees to the extent any may be involved in connection with the photographs at issue.  The availability of these requests for relief implicates the terms of Article III of the CBA.

---

[9]   In addition to implicating Article XIII, the question of requiring confidentiality may necessitate an interpretation of §5 of Article III of the CBA which states that the CBA constitutes the entire agreement between the parties.

Further, the Union asserts that DuPont had an obligation to file a grievance under Article IX of the CBA, as well as an obligation to arbitrate any dispute under the terms of the CBA pursuant to Article X. The grievance process established under Article IX seems to contemplate grievances filed by a DuPont employee, not by DuPont  See Docket No. 16, Exhibit A, Article IX. However, inasmuch as DuPont seeks to impose confidentiality requirements upon the Union in connection with its negotiations of working conditions pursuant to Article XIII, as well as other restrictions upon the Union's ability to provide fair representation to its members, an interpretation of Article X of the CBA is required to determine whether DuPont must submit this dispute to arbitration.

The motion for remand is denied. The determination of the Union's right to possess pictures of dangerous work conditions is inextricably intertwined with its rights and duties under the CBA to represent its members and negotiate with DuPont as to health and safety issues at the Niagara Site. The Court must interpret portions of the CBA to determine the scope of the Union's rights and obligations in connection with their representation of its members on these issues. Because the Court must look to the terms of the CBA to determine the scope of the Union's rights and obligations relating to the possession of evidence of unsafe working conditions, DuPont's state law claims are preempted under §301. See United Steelworkers of Am. v. Rawson, 495 U.S. 362 (1990)(wrongful death claims by families of miners preempted inasmuch as claims require inquiry of the scope of the rights and duties of the defendant under the CBA).

It would undermine the purposes of §301 to hold that issues relating to the possession of purported evidence of unsafe working conditions must be litigated in the state courts, even

though those same alleged unsafe working conditions are the subject of the CBA, the NLRB Decision and on-going negotiations between the parties *pursuant to the CBA*.  The fact that the Court finds that the state court claims relating to possession of the purported evidence of unsafe working conditions are preempted by §301 is not a finding that the Union is properly in possession of those pictures.[10]   The finding that these issues are preempted by §301 is consistent with the holding in Allis-Chalmers Corp. recognizing that §301 is "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." Allis-Chalmers Corp., 471 U.S. at 209.  Such a decision also recognizes that the Union's right to evidence of unsafe working conditions in this case may be impacted by the CBA, various NLRB decisions and federal labor statutes, and may not be limited merely to the parameters of state property law claims involving the return of chattel, conversion or misappropriation of trade secrets as asserted by DuPont.

Based on the above, the motion to remand this matter to the state court is denied.

So Ordered.

s/Hon. Hugh B. Scott
United States Magistrate Judge

Buffalo, New York
May 19, 2005

---

[10] The ultimate question of whether or not the Union may retain possession of the pictures is not part of the instant motion.  Thus, the Court makes no finding as to whether the CBA, the NLRB Decision or other federal statutes permit the Union to retain evidence of purported unsafe working conditions under the circumstances in this case.